# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

————————————

UNITED STATES OF AMERICA

        Plaintiff,

vs.                                  Case No. 1:20-CR-00329 KWR

MANUEL ARVIZO,

        Defendant.

## **<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court on Defendant's Motion to Suppress Evidence (**Doc. 63**) and Motion to Suppress Statements as well as Evidence Derived from those Statements (**Doc. 90**). Because both motions rely on a similar set of facts and argument, the Court rules on them together. On March 2 ("Hearing I") and March 17, 2022 ("Hearing II"), the Court held an evidentiary hearing on these and other motions filed by Defendant. Having reviewed the pleadings and evidence and heard oral argument and testimony at the hearings, the Court finds that Defendant's Motion to Suppress Evidence (**Doc. 63**) is well-taken, and therefore, is **GRANTED**; Defendant's Motion to Suppress Statements (**Doc. 90**) is well-taken, and therefore, is **GRANTED**.

## BACKGROUND

Defendant Manuel Arvizo faces two charges: (1) felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924, and (2) possession with intent to distribute a mixture and substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Defendant seeks to suppress evidence obtained from two search warrant applications made by Lieutenant Richard Lopez of the Socorro County Sheriff's Office ("SCSO" or "Sheriff's Office")

and granted by a New Mexico state court judge.  At issue are searches of a 2006 Dodge Stratus vehicle and a home at 148 Navajo Way, Datil, New Mexico.

Defendant first argues that the towing and impoundment of his car was unconstitutional. **Doc. 63, at 4–10**.  Defendant then argues that the search warrants for the vehicle and the home at 148 Navajo Way were not supported by probable cause, and therefore, any evidence seized as a result of the deficient warrants are fruit of the poisonous tree and must be suppressed.  *Id.* **at 12– 18**.  Finally, Defendant argues that this Court must hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) because Lt. Lopez knowingly or recklessly misrepresented or omitted material information from the affidavits in support of the warrants.  *Id.* **at 18–22**.

The United States disputes each of the arguments regarding the search of the vehicle.[1]  In addition, the Government raises new grounds.  The Government argues that Defendant has no standing to challenge the search of the vehicle.  **Doc. 99, Hr'g II Tr. 51**.  The Government also argues that SCSO officers had probable cause to search Defendant's vehicle, even without a warrant, and relatedly, probable cause to arrest him.  *See* **Doc. 70, at 7–8**.  Finally, the Government argues that even if a constitutional violation did occur, the evidence from the vehicle should not be suppressed due to the doctrine of inevitable discovery and the good faith exception.  *Id.* **at 10– 11**.

Defendant further argues that the search warrant for the home at 148 Navajo Way is invalid because the supporting affidavit included his unwarned, custodial statements in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  *See* **Doc. 90**; **Hr'g II Tr. 51**.  The United States contends that even in the absence of these statements, the warrant for the home independently establishes probable cause.  **Hr'g II Tr. 9–11**.

---

[1] The Government's response is silent on arguments for the 148 Navajo Way search warrant.

The Court concludes that the United States has failed to establish that the warrantless impoundment of Defendant's vehicle was valid under the Fourth Amendment. In turn, Defendant has met his burden to show that the search warrants for the 2006 Dodge Stratus and 148 Navajo Way were invalid. The Government failed to show that any exception to the Fourth Amendment precludes suppression. Therefore, the evidence seized from the vehicle and the home must be suppressed.

## FINDINGS OF FACT

The Court heard the testimony of Captain Lee Armijo, Sheriff William Armijo, Undersheriff Amanda Vega, Detective Gilbert Padilla, Jr., Officer Tim Gutierrez, Lieutenant Richard Lopez, all from the SCSO, and Defendant Arvizo. The Court makes the following factual findings based on the evidence presented and the Court's assessment of the credibility of the witnesses. The Court relays only those portions of testimony relevant to the resolution of these motions.

### The History between Defendant and Lt. Lopez

Lt. Lopez has been a police officer for 28 years and has been with the SCSO since 2015. Lt. Lopez previously focused primarily on narcotics crimes. He had known about Defendant for several years prior to the incident giving rise to the instant charges. **Doc. 102, Hr'g I Tr. 72, 74–75, 139**. His more detailed personal knowledge of Defendant, though, came from a criminal investigation into a burglary in Catron County, New Mexico. These incidents were mentioned by Lt. Lopez in the affidavits in support of the warrants for the 2006 Dodge Stratus and 148 Navajo Way.

Relevant here, the criminal investigation of Defendant regarding a burglary in Catron County occurred in June 2019. **Gov't Ex. 4**; **Gov't Ex. 5**. The burglary investigation arose after

a homeowner in Catron County reported around June 10, 2019 that his home had been burglarized while he was away.  The burglary was investigated by law enforcement officials from Catron County, and one of the Catron County officers enlisted in the help of Lt. Lopez, along with the homeowner, who informed Lt. Lopez of the items that were stolen.

Separately, Defendant had recently been arrested by SCSO officers while driving a stolen vehicle (unrelated to the 2006 Dodge Stratus).  SCSO officers applied for a search warrant for this stolen vehicle because they believed some items inside the vehicle were also stolen.  Lt. Lopez, although not involved with the arrest of Defendant, executed a search warrant on the stolen vehicle, and thus, documented the items found in the vehicle.

During his investigation of the Catron County burglary, Lt. Lopez realized that the search warrant he had executed earlier on the stolen vehicle driven by Defendant contained some of the items reported as stolen by the victims of the burglary.  **Hr'g I Tr. 72–73, 77–79**; **Gov't Ex. 4, at 3**.  Lt. Lopez continued to investigate the burglary, and Defendant was later implicated in the crime by his alleged accomplice.  Lt. Lopez then managed to locate some of the stolen items in Defendant's possession; some items were found in the 2006 Dodge Stratus, and other items were found at 148 Navajo Way, the home of Defendant's aunt and uncle.  **Hr'g I Tr. 79–85**; **Gov't Ex. 4, at 3–4**.

As a result of Lt. Lopez's joint investigation with Catron County police officials, on June 24, 2019, an arrest warrant was issued for Defendant for burglary and larceny.  **Gov't Ex. 4, at 2**. No guns or weapons were reported stolen by the victims of the burglary, nor were guns or weapons mentioned in the affidavit in support of the arrest warrant for Defendant for his involvement in the burglary.  **Gov't Ex. 4**; **Gov't Ex. 5**; **Hr'g I Tr. 132–34, 149–50, 163–66**. No guns were ever found in Defendant's possession related to this burglary.  The most notable item recovered from

the burglary from Defendant was, in fact, a green camouflage shower curtain.  **Hr'g I Tr. 80–84, 162–63**; **Gov't Ex. 5, at 3**.[2]  On August 2, 2019, the warrant was executed, and Defendant was arrested.  **Gov't Ex. 4, at 1**.  There no longer remained any pending warrants for Defendant's arrest.

**The Search of the 2006 Grey Dodge Stratus**

Months later, on November 19, 2019, Lt. Lopez received information from a confidential informant that an individual named "Smurf" was "trying to sell some firearms" from the trunk of his grey Dodge Stratus vehicle in the Socorro area.  **Hr'g I Tr. 74–75**.  Lt. Lopez had utilized the confidential informant for purchasing narcotics during his past investigations into narcotics-related crimes.  This informant was "working for money," and did not inform Lt. Lopez about how he received this information.  **_Id._ at 119–20**.

Lt. Lopez was familiar with the alias "Smurf," which he believed referred to Defendant, and was aware the Defendant had been convicted of a felony and could not lawfully possess a firearm.  **_Id._ at 75–76**.  Additionally, this grey Dodge Stratus was ostensibly Defendant's vehicle. Although SCSO officers were aware that the vehicle was registered to a third-party, Jack Cantrell, Defendant appeared to exclusively use the vehicle.  **_Id._ at 81–82, 84, 93–94**.  Defendant testified that Mr. Cantrell had loaned him the vehicle at the beginning of 2019 until Defendant's own car was repaired.  **Hr'g II Tr. 24, 28–29, 32**.

Around the same time, Sheriff Armijo received information from a confidential informant that at 1206B Santa Fe Lane in Socorro, New Mexico, an individual was "unloading" or "loading" "stolen firearms" into the grey vehicle.  Information about the background or details of this

---

[2] Lt. Lopez testified that the victims of the Catron County burglary "were missing some firearms."  **Hr'g I Tr. 133**. This statement is clearly contradicted by the record, which includes a detailed list of stolen property created by one of the victims and sent to Catron County law enforcement.  *See* **Gov't Ex. 5**.

informant were unknown.  Sheriff Armijo contacted Lt. Lopez about the information that he had received, and Lt. Lopez informed him that he had already received the same information and would meet him at Santa Fe Lane.  **Hr'g I Tr. 38–39, 74–75, 156**.

Lt. Lopez, along with Cpt. Armijo, travelled to Santa Fe Lane to meet Sheriff Armijo and confirm the information received.  Lt. Lopez was familiar with the home at 1206B Santa Fe Lane because the home was associated with narcotics activity.  He also knew that the home was owned by Judith Mascarenas and resided in by other Mascarenas family members; and he was aware that Defendant had a personal relationship with Jessica Mascarenas, Judith's daughter.  *Id.* **at 75–77**.  Defendant testified that he was in an intimate relationship with Jessica Mascarenas and he had been living with her at the home.  **Hr'g II Tr. 24, 34**.  The homes on Santa Fe Lane are trailer-homes, and the driveway of 1206B Santa Fe Lane is a gravel, unpaved pathway.  **Hr'g I Tr. 86**.  There is only one way in and out of the neighborhood, and the road forming Santa Fe Lane leads to a dead-end.  *Id.* **at 24**.

Upon arrival at 1206B Santa Fe Lane, Lt. Lopez observed Defendant standing at the trunk of a grey Dodge Stratus parked in front of the home; a Nissan Altima[3] was also parked alongside the grey Dodge Stratus.  When Defendant saw the SCSO officers, Defendant immediately slammed shut the trunk of the vehicle and began to walk away.[4]  Lt. Lopez testified that he saw "something that look[ed] round and cylindrical" he "thought" was a barrel of a rifle just before Defendant closed the trunk.  Lt. Lopez said to Cpt. Armijo, "look, a gun!" or a similar phrase.  As a result, Lt. Lopez and Cpt. Armijo immediately exited their vehicle, and Lt. Lopez placed

---

[3] SCSO officers gave slightly different testimony regarding the color of this vehicle, including black, **Hr'g I Tr. 15** (testimony of Cpt. Armijo), "purplish," *Id.* **at 88–89**, and "red," *Id.* **at 161** (testimony of Lt. Lopez).

[4] *Compare* **Hr'g I Tr. at 16** (testimony of Cpt. Armijo) ("[H]e didn't run or anything, he just started to walk away, and he didn't get but a few steps before he was taken into custody.") *with id.* **at 86–87** (testimony of Lt. Lopez) ("Mr. Arvizo slams the trunk and he goes to run, but I'm right behind him immediately.") *and* **Doc. 81-1, Ex. F** (affidavit of Lt. Lopez) ("Manuel shut the trunk and began to walk away.").

Defendant in "investigative custody" and began to secure the scene.  *Id.* **at 13, 85–88, 104**.  Cpt. Armijo testified that upon hearing Lt. Lopez exclaim that he saw a gun, he too believed he "thought" he saw "something" like a barrel coming out of the "left side" trunk.  *Id.* **at 13, 20–21**.

On cross-examination, Cpt. Armijo conceded that he did not mention the sight of a barrel of a gun in his incident report completed after Defendant's arrest.  *Id.* **at 35–36**.  Lt. Lopez also admitted that what he initially thought was a gun was "a little piece of pipe that was in the trunk." *Id.* **at 104, 126**.  This "pipe" was not recovered, documented, or photographed by any party on the scene.  *Id.* **at 60, 104**; **Def. Ex. A**; **Gov't Ex. 6, at 112–13**.

There were now between three and five Sheriff's Office units on the scene.  Four other individuals were also on the scene when the SCSO officers arrived, and these individuals were arrested.  **Hr'g I Tr. 14–15, 25, 121–22**.  None of these four individuals were arrested for weapons. *Id.* **at 122**.  At some point, Lt. Lopez decided to arrest Defendant.  Lt. Lopez was aware that Defendant was on parole and probation, however, he was unaware of whether Defendant had violated any conditions of his release and unaware of any outstanding warrants for Defendant's arrest.  He arrested Defendant solely based on his observations on the scene.  *Id.* **at 87–88, 142– 43**.  Upon arrival at the local jail, Defendant was charged and "booked" with a probation violation. *Id.* **at 162**.

The owner of the Nissan Altima adjacent to the Dodge Stratus, Judith Mascarenas, gave SCSO officers consent to search her car.  In the Nissan Altima, officers found up to a thousand rounds of ammunition.  *Id.* **at 88–91**; **Gov't Ex. 1**.  Lt. Lopez concluded that the Dodge Stratus was possibly implicated in a crime and needed to be searched, thus, he decided to tow Defendant's car to a secure Socorro County facility.  Lt. Lopez testified that the usual practice of the SCSO is to tow vehicles when staffing issues prevent officers from remaining at the scene to secure the

vehicle or when officers, due to the limited number of state and local district court judges, are unable to obtain a search warrant the same day.  **Hr'g I Tr. 92–93, 136–139**; *see also id.* **at 40–41** (testimony of Sheriff Armijo) (same).  Lt. Lopez testified that this practice is "just the way [SCSO officers] kind of have to do things." *Id.* **at 136**.

On this day, Lt. Lopez reasoned that towing the vehicle was appropriate for several reasons. First, because the vehicle was registered to a third-party, Mr. Cantrell, not Defendant; second, because there was a "manpower" issue and the SCSO could not spare the resources to have an officer remain with the vehicle for several hours or more pending a search warrant; and third, because Lt. Lopez thought he may find more ammunition or a weapon in the Dodge Stratus based on the ammunition in the Nissan Altima, he believed that there were officer safety concerns if the vehicle was searched in the public view. *Id.* **at 94–96, 136–38**; *see also id.* **at 40–41** (testimony of Sheriff Armijo) ("[S]o for officer safety purposes and for preservation of evidence we remove that vehicle from the location and take it to a secure scene to execute the search warrant.").  Lt. Lopez was also familiar with the area and did not feel "comfortable leaving one officer" alone with the vehicle because he was concerned that someone in the community could "distract[]" the officer and "tamper[] with the evidence in the car." *Id.* **at 95**.  An inventory search was not conducted prior to the tow. *Id.* **at 145**.

After the car was towed, Lt. Lopez applied for a warrant.  In the affidavit in support of the warrant, Lt. Lopez recounted the information he received from the informant, his knowledge about Defendant from the Catron County burglary and Defendant's status as a felon, and he stated that he saw what he "knew to be the barrel of a firearm" in Defendant's trunk. *See* **Doc. 81-1, Ex. F, at 3**.  The warrant was granted the same day, November 19 at 3:18 PM, and later that afternoon, Lt. Lopez searched and inventoried the grey Stratus pursuant to this warrant.  **Hr'g I Tr. 51, 98–**

**101**; **Gov't Ex. 7, at 181**.  The search warrant inventory return, however, was signed and dated by the judge or a clerk of the court on November 19 at 10:00 AM, **Gov't Ex. 7, at 178–80**, and was filed by the court clerk on December 4, 2019.  *Id.*; *see also* **Hr'g I Tr. 146–49**.  The search of the vehicle revealed several rifles, pistols, shotguns, tactical gear, and drugs, giving rise to the instant charges.

**The Search of 148 Navajo Way**

The next day, on November 20, 2019, Lt. Lopez and Federal Bureau of Investigation Special Agent Leysha Lopez interviewed Defendant while he was incarcerated at the Socorro County Detention Center.  Lt. Lopez sought cooperation from Defendant to ascertain the origin of the weapons discovered in the vehicle.  During this interview, Defendant declined to cooperate, but implied that there may be more weapons.  Lt. Lopez and Agent Lopez did not inform Defendant of his *Miranda* rights before initiating this discussion.  **Hr'g I Tr. 105–10, 152–53**; *see also* **Hr'g II Tr. 8–9**.

Later, Lt. Lopez was contacted by two confidential sources.  One of the sources, the same source who initially provided information about the potential weapons in the Dodge Stratus, told Lt. Lopez that Defendant may have more weapons.  The second source, now identified as Jessica Mascarenas, **Hr'g I Tr. 110**, revealed that Defendant may have more weapons at his family's residence at 148 Navajo Way in Datil, New Mexico.  Jessica Mascarenas, in exchange for the information she provided, had an outstanding bench warrant quashed and was released from jail the same day.  *Id.* **at 145**.

Based on this information, on November 21, 2019, Lt. Lopez sought a search warrant for 148 Navajo Way.  In the warrant application, Lt. Lopez repeated the information from the warrant application for the Dodge Stratus, and he included details of the items seized from the Dodge

Stratus, the statement that Defendant made when interviewed at the Socorro County Detention Center, and the information from the two confidential informants.  The warrant was granted the same day, on November 21 at 3:37 PM, and executed in the evening.  **Hr'g I Tr. 110–15**; **Gov't Ex. 7, at 184**.  The search warrant inventory return, however, was signed and dated by the judge or a clerk of the court on November 19 at 10:00 AM, **Gov't Ex. 6, at 106**, and was filed by the court clerk on December 4, 2019.  *Id.*; *see also* **Hr'g I Tr. 146–49**.  The search of the home revealed one rifle and tactical gear, some of which matched the items found in the trunk of the Dodge Stratus.

## DISCUSSION

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  When a motion to suppress involves a warrantless search, the defendant bears the prima facie burden "of showing the Fourth Amendment was implicated," and if this burden is met, then "the government has the burden of proving its warrantless actions were justified."  *See United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (internal citations omitted).  However, "if the search or seizure was pursuant to a warrant, the defendant has the burden of proof."  *See United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994).

On a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion."  *Goebel*, 959 F.3d at 1265.  The Court concludes, after a review of the testimony, the evidence presented, and an assessment of the parties' credibility, that the evidence obtained from the vehicle and the home must be suppressed.

As will be discussed in detail, the testimony of several officers from the Socorro County Sheriff's Office was often equivocal, inconsistent, and largely, not credible.

I.  **Whether the Impoundment of Defendant's Vehicle was Justified under the Community Caretaking Exception.**

Initially, the United States argues that Defendant has no standing to contest the search of the 2006 Dodge Stratus.  **Hr'g II Tr. 51–52**.  The Court disagrees.

In order to proceed with a Fourth Amendment challenge, the moving party must have a sufficiently personal interest in the place or property, and a party may not challenge an allegedly illegal search or seizure of a third party's property.  *See United States v. Davis*, 750 F.3d 1186, 1190 (10th Cir. 2014); *United Stated v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001).  A person seeking to suppress evidence found as a result of a vehicle search must show that he had a "possessory or property interest in the vehicle searched."  *See United States v. Mosely*, 743 F.3d 1317, 1322 (10th Cir. 2014) (internal quotations omitted).  Therefore, a defendant must have a "reasonable expectation of privacy" in the vehicle being searched.  *See United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021); *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.").

"Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself."  *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003).  Rather, to resolve standing issues involving a vehicle, the Court may consider factors such as: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant

presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Id.* (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir.2000)).

Here, the Court concludes that though Defendant was not the registered owner of the 2006 Dodge Stratus, he has standing to bring this Fourth Amendment challenge. Defendant testified that he lawfully obtained the vehicle from Jack Cantrell, the registered owner. Defendant also testified that Mr. Cantrell gave him permission to use the vehicle, and Defendant had been driving the vehicle for months prior to the impoundment and his arrest. Defendant had also appeared with Mr. Cantrell to reclaim the vehicle when it was impounded in the past, evincing that Mr. Cantrell consented to Defendant's use of the vehicle. **Hr'g I Tr. 93–94** (testimony by Lt. Lopez stating that when the vehicle was towed in the past, Mr. Cantrell and Defendant arrived together to take the vehicle back into possession). The Government presented no evidence to the contrary.

"Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." *See United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990) (collecting cases) (concluding that the defendant had standing where defendant testified that the apparent owner of the car loaned him the vehicle). Here, Defendant's regular and daily months-long use of the vehicle, in addition to lawful possession and permission granted by the vehicle's owner, shows that Defendant had a reasonable expectation of privacy in the vehicle. Thus, the Court finds that Defendant has offered sufficient evidence that he had a possessory interest in the 2006 Dodge Stratus, and he has standing to challenge the search of the vehicle. *See United States v. Miller*, 821 F.2d 546, 548–49 (11th Cir. 1987) (collecting cases).

Here, Defendant challenges the legality of the SCSO officers' decision to impound his car. Generally, "seizures of personal property are unreasonable…unless [the seizure is] accomplished pursuant to a judicial warrant issued by a neutral magistrate after finding probable cause." *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (cleaned up). One exception to the warrant requirement is the "community caretaking function." *See S. Dakota v. Opperman*, 428 U.S. 364, 368 (1976). Under this exception, police officers have the authority to "remove from the streets vehicles impeding traffic or threatening public safety." *Id.* Thus, law enforcement officers may conduct a warrantless seizure of a vehicle without violating the Fourth Amendment when performing community caretaker functions—those actions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *see also United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020).

The Fourth Amendment, however, "imposes heightened requirements on police who seize vehicles from private property." *See United States v. Woodard*, 5 F.4th 1148, 1152 (10th Cir. 2021) (quoting *United States v. Sanders*, 796 F.3d 1241, 1249 (10th Cir. 2015)). These requirements allow impoundments from private property "only when (1) the car is blocking traffic, (2) the car is posing an imminent threat to public safety, or (3) the impoundment is justified by a standardized policy and a reasonable, non-pretextual rationale of community caretaking." *Id.*; *see also United States v. Trujillo*, 993 F.3d 859, 867 (10th Cir. 2021).

In other words, under the community caretaking exception, an "impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified [1] by both a standardized policy and [2] a reasonable, non-pretextual community-caretaking rationale." *Sanders*, 796 F.3d at 1248.

"The standardized criteria prong ensures that police discretion to impound vehicles is cabined rather than uncontrolled, and the existence of such standardized criteria is the touchstone of the inquiry into whether an impoundment is lawful." *See United States v. Venezia*, 995 F.3d 1170, 1176 (10th Cir. 2021) (internal quotations omitted); *Sanders*, 796 F.3d at 1250.

Under the second prong, to determine whether an impoundment is justified by a reasonable and legitimate, non-pretextual community-caretaking rationale, the Court may consider the following non-exhaustive list of factors:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Sanders*, 796 F.3d at 1250; *see also Venezia*, 995 F.3d at 1177.

The United States "bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment." *Sanders*, 796 F.3d at 1244. The Government must point to "specific and articulable facts which reasonably warrant an intrusion into the individual's liberty and must show that the government's interest outweighs the individual's interest in being free from arbitrary governmental interference." *Neugin*, 958 F.3d at 931 (internal quotations and alterations omitted). "Granting police discretion over whether to impound and inventory a vehicle is permissible so long as officers exercise that discretion according to standardized criteria, and not 'in bad faith or for the sole purpose of investigation.'" *See United States v. Taylor*, 592 F.3d 1104, 1108 (10th Cir. 2010) (quoting *Colorado v. Bertine*, 479 U.S. 367, 374–75 (1987)).

In this case, there is no dispute that Defendant's vehicle was seized without a warrant. It is also undisputed that at the time of the impoundment, the vehicle was located on private property and not blocking or impeding traffic. Therefore, for the impoundment to be reasonable under Supreme Court and Tenth Circuit precedent, Lt. Lopez's decision to impound the vehicle must fall

within law enforcement's public safety functions, or be guided by some degree of standardized criteria and for the purpose of community caretaking.

## A.  Imminent Threat to Public Safety.

First, the United States asserts that there were significant public safety concerns requiring the impoundment of the 2006 Dodge Stratus because the adjacent Nissan Altima, "had large quantities of ammunition in it" and was implicated in a criminal investigation involving the trafficking of firearms, and therefore, it would have been in the best interest of the Mascarenas family to "rid Defendant's car of evidence." *See* **Doc. 70, at 14**.  The Government also argues that "[i]t would have been placing the officers in danger to have in fact left the car there or tried to search it there."  *See* **Hr'g I Tr. 91**; **Hr'g II Tr. 54** (same).  Defendant argues that it is unclear how the Mascarenas' vehicle is "pertinent to the analysis" of public safety.  *See* **Doc. 73, at 19**.

Here, Lt. Lopez testified that the Dodge Stratus was towed because of "manpower" and "resource" issues, the potential for an individual to tamper with the evidence if left at the scene, and because Lt. Lopez did not know what evidence the SCSO were "dealing with" in the trunk. *See* **Hr'g I Tr. 40–41, 94–96, 136–38**.  On this basis, the Court cannot conclude that the location of the Dodge Stratus posed an imminent threat to public safety.

The desire to preserve evidence is distinct from any threat the vehicle may have posed to the public.  Curiously, notwithstanding concerns about officer safety or preservation of evidence, the Nissan Altima, the car to which the SCSO officers suspected upon their arrival of the scene may contain weapons, was searched by the SCSO officers on-site and in the driveway of the home without an impoundment.

Additionally, "[p]ublic safety and convenience are less likely to be at risk when the vehicle is located on private property as opposed to public property."  *See Venezia*, 995 F.3d at 1178.  The

vehicle was parked in the driveway area of the home at 1206B Santa Fe Lane.  The location included trailer-homes, was in a rural area, and the home itself was located on a dead-end road, with only one way in and out of the street.  In general, there was a reduced risk that neighbors or the general populace would encounter the vehicle.  Thus, even if the officers saw a weapon in the trunk of the vehicle, the closed trunk and secluded nature of the vehicle's location lends the conclusion that the vehicle itself did not pose an imminent threat to public safety.  *See Chavez*, 985 F.3d at 1244 (noting that the Supreme Court "has consistently accorded law enforcement officials greater latitude in exercising their duties in public places, but the same is not said for private, secluded locations.").

Moreover, the Court finds that prior to the decision to tow, the SCSO officers did not see a gun in the trunk of the Dodge Stratus, further collapsing the Government's public safety argument.  The testimony of Lt. Lopez and Cpt. Armijo was not credible regarding the possible sighting of a barrel of a gun in the trunk of the Dodge Stratus.  First, Cpt. Armijo's possible sight of a gun appears to have been directly influenced by Lt. Lopez's exclamation of "Look, a gun[!],"  and Cpt. Armijo, along with Lt. Lopez, immediately exited the truck without a chance for observation.  *See id.* **at 13** (testimony of Cpt. Armijo) ("[Lt. Lopez's words] took my attention, and I saw what I thought was like a barrel coming out of the trunk, and -- and at that point we bailed out of the trucks.").  Cpt. Armijo also appears uncertain as to whether he "thought" he saw a gun or whether he knew he saw a gun.  *See id.* **at 35** ("At the time they tell you, you know, there's guns, *I saw it* and I thought. *Well, maybe that could be a gun*, you know, is that the gun[?]").  Cpt. Armijo also did not mention the sight of a barrel of a gun in his incident report completed after Defendant's arrest.  ***Id.* at 35–36**.

Second, Lt. Lopez, too, wavered about the sight of a gun.  Lt. Lopez, in his warrant application, stated he "knew" he saw the barrel of a rifle.  However, he testified that he "thought" he saw the rifle, and much later, admitted it was a pipe.  ***Id.* at 104, 126**.  Still, this pipe was never recovered or documented.  Further still, the evidence belies the possibility that the parties could have seen a gun or pipe.  The parties consistently testified that Defendant was standing in front of the trunk, and he "immediately" shut the trunk upon the arrival of the officers without time to hide or move any items.  ***Id.* at 20, 87, 144–45**.  The evidence shows that the view of the trunk, untouched after Defendant's arrest and before the vehicle search began, is an overfilled trunk with closed bags, the contents of which the SCSO officers admittedly could not see, likely because Defendant's body blocked their full view of the trunk before he immediately closed it and because of the initial distance between the officers and the trunk.  ***Id.* at 51–52, 103–104**; **Def. Ex. A; Def. Ex. C; Def. Ex. D**.  No pipe, gun, or long, cylindrical object is visible, nor does it look possible for a barrel of a long rifle to have fit in the small space remaining in the trunk.

Although the parties may have expected to see a gun, *see, e.g.*, **Hr'g I Tr. 86–87** (testimony of Lt. Lopez) ("You know, we're told there's a bunch of guns, and that may play in your head that you're looking for guns."), the Court concludes that neither Lt. Lopez nor Cpt. Armijo saw the barrel of a gun in the trunk of the Dodge.[5]  In this case, SCSO officers admittedly towed the vehicle because of limited resources, staffing issues, and a potential risk of destruction of evidence or officer safety.  The United States can point to no "specific and articulable facts" demonstrating a concern for a legitimate, imminent threat to public safety based on the location of the car.

---

[5] Another insufficiently explained occurrence bearing on the Court's credibility determination was that the SCSO officers appeared to switch lapel cameras during their interactions with Defendant, thus, much of the recovered video evidence fails to capture what happened on scene.  *See* **Hr'g I Tr. 33** (testimony of Cpt. Armijo) ("[I]t appears that it initially was the sheriff's camera, and when [Jessica Mascarenas] needed to go to the bathroom, [Sheriff Armijo] gave it to Detective Lopez and that's how [Lt. Lopez] ended up with [the camera] in the second half."); **Hr'g I Tr. 144** (testimony of Lt. Lopez) ("I know that partially through the incident [my camera] died, and I then took over the sheriff's camera.").

Accordingly, the impoundment can be valid under the community caretaking function only if justified by a standardized policy and a reasonable, non-pretextual community-caretaking rationale.

### B.  Standardized Criteria or Policy.

The United States asserts that there was a non-pretextual community-caretaking rationale for impounding the vehicle.  *See* **Doc. 70, at 14**.  The United States argues, first, that the Socorro County Sheriff's Office has a "standardized practice" of towing vehicles, and points summarily to three impoundments of vehicles that Defendant was driving after he was arrested by SCSO officers in previous criminal cases.  **Hr'g II Tr. 35**, **55**.  The Government's arguments are unpersuasive.

Here, the United States did not direct the Court to any state or local impoundment policy or statute, and the Government conceded that the SCSO does not have a written impoundment policy.  *Id.* **at 35**.  The lack of a written policy, however, is not dispositive.  *See United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996).  The requirement is that "standardized criteria guide impoundments on private property."  *Sanders*, 796 F.3d at 1249.

After a review of the record, the Court finds that the Socorro County's Sheriff's Office did not follow any standardized criteria in the decision to impound Defendant's vehicle.  Lt. Lopez, despite his years on the force with the SCSO, could not recall the details of the SCSO impoundment practice, and according to him, the SCSO just "tend to tow" vehicles.  **Hr'g I Tr. 136–37**.  He admitted that the Dodge Stratus was towed because of staff shortages and a lack of police resources.  *Id.*  Yet, police officers cannot randomly or indiscriminately decide which vehicles they are going to impound, and cannot rely on staffing issues or judge unavailability, alone, as a basis to determine whether to impound a vehicle.  Thus, the practice or unwritten policy on which the SCSO rely appears to give officers unfettered discretion to tow the car.  The Court is also

unpersuaded that the impoundment of Defendant's vehicle on previous occasions bears on whether the alleged SCSO practice follows standardized criteria to ensure that it is "cabined rather than uncontrolled." *Venezia*, 995 F.3d at 1176. Thus, the Government has not shown that standardized criteria or standardized procedures guided Lt. Lopez's decision to tow the vehicle. The first *Sanders* prong has not been met.

## C. Non-Pretextual Community Caretaking Rationale.

The absence of standardized criteria is sufficient for this Court to find that the impoundment was unconstitutional. Here, however, the impoundment was unlawful for an independent reason: it was not justified by a reasonable, non-pretextual community caretaking rationale. In other words, SCSO officers made the decision to impound Defendant's vehicle largely on suspicion of evidence of criminal activity.

### 1. Factor One: Public or Private Property.

Defendant argues that the impoundment was improper because "the car was on private property, parked next to the trailer where Mr. Arvizo lived." *See* **Doc. 63, at 9**. Defendant maintains that the officers' "singular purpose in towing the car was to continue their criminal investigation and search the car for contraband." *Id.* **at 10**. The Government contends that even though the Defendant's car was on private property, "the unique dynamics of the situation would not allow for the Officers to leave Defendant's vehicle on the property." **Doc. 70, at 14**. The Government again raises concerns related to the Nissan Altima, the quantities of ammunition found in that vehicle, and the interest of the Mascarenas family to want to destroy the evidence in Defendant's vehicle. *Id.*

Here, the vehicle was parked on the private property of Defendant's romantic partner and her mother, and there was no imminent threat to public safety while the vehicle was parked on the

property, which was in a rural location on a dead-end street. Thus, this factor weighs in Defendant's favor.

### 2. Factor Two: Consulting the Private Property Owner.

Second, Defendant argues the SCSO officers "decided to tow the car right away, without any discussion of or inquiry into the property owner's preference." *See* **Doc. 63, at 9**. The Government contends that it could not consult with the car's owner because the car was registered to Mr. Cantrell, who was not present on the scene, and it "was unclear whether Defendant had any legitimate connection to the vehicle and he did not make such a claim." **Doc. 70, at 14–15**.

Here, the relevant inquiry under this factor focuses on the property owner, not the vehicle owner. The Government failed to consult the property owner, Judith Mascarenas,[6] about whether the car could remain on the property. Thus, this factor also weighs in Defendant's favor.

### 3. Factor Three: Alternatives to Impoundment.

Third, the Government maintains that "it was unreasonable to allow Defendant to find an alternative driver or find an alternative means of moving the vehicle" because Defendant's connection to the vehicle was unclear at the time. **Doc. 70, at 14–15**.

Here, Lt. Lopez could not contact Mr. Cantrell prior to the impoundment of the vehicle because the vehicle's registration document did not provide his phone number. *See* **Hr'g I Tr. 96**. Still, it appears that several alternatives to impoundment existed. The vehicle could have remained at the location until Judith Mascarenas objected to the vehicle's presence, or until the officers later contacted Mr. Cantrell, or until there was reason to believe Mr. Cantrell could not be contacted and the vehicle would be abandoned. *See Venezia*, 995 F.3d at 1179. Thus, this factor weighs in Defendant's favor.

---

[6] Ms. Mascarenas was not detained and there were no allegations she was involved in criminal activity.

### 4.   Factor Four: Implicated in a Crime.

Next, Defendant alleges that "the car itself was not evidence of a crime…[and] the officers had not seen anything which gave them grounds to arrest him or reasonably believe the car was evidence of a crime." **Doc. 63, at 9–10**.  The Government contends that "the vehicle was clearly implicated in a crime in this case, so it was reasonable for Officers to tow the vehicle from the scene." **Doc. 70, at 15**.  The Government alleges that "when Officers pulled up on the scene where the crime was occurring, Officer Lopez saw the barrel of a firearm sticking out of the open trunk lid." *Id.*

Here, there was a plausible inference that Defendant's vehicle was implicated in a crime. Although Lt. Lopez did not see a gun, after the search of the adjacent vehicle revealed ammunition, based on the information that SCSO officers had regarding the movement or sale of guns from a vehicle and Lt. Lopez's knowledge about Defendant's previous felony conviction barring possession of weapons or ammunition, the officers plausibly suspected that the grey Dodge Stratus may have held contraband.  Thus, this factor weighs in the Government's favor.

### 5.   Factor Five: Consent of Owner and/or Driver.

Defendant argues that the officers did not ask whether he consented to the impoundment of his vehicle.  *See* **Doc. 63, at 9**.  The Government maintains that Defendant's ownership of the vehicle was unclear, and the registered owner, Mr. Cantrell, was not present and could not be consulted.  *See* **Doc. 70, at 14–15**.

Though Defendant has now established an interest in the vehicle, at the time of the impoundment, the SCSO officers were aware only that the vehicle was registered to Mr. Cantrell and Defendant was known to drive it.  Further still, Lt. Lopez could not contact Mr. Cantrell at the time because the vehicle's registration did not provide his phone number.  Thus, the Court will

conclude that this factor likely weighs in the Government's favor.  *See Venezia*, 995 F.3d at 1182 (conceding that because "the officers could not determine at the time [of his arrest] that [defendant] Mr. Venezia owned the vehicle, his consent or lack thereof was not terribly relevant to the impoundment decision").  In sum, three of the five factors weigh in Defendant's favor.

The United States has failed to meet its burden to show that the impoundment of the vehicle was justified by a standardized policy and a reasonable, non-pretextual community-caretaking rationale.  Thus, the seizure of Defendant's vehicle without a warrant was not lawful.  Yet, that the seizure of the vehicle was unlawful does not end the Court's inquiry.  The admissibility of the items found in the car also depends on the validity of the search that led to their discovery.

## II.    **Whether the Search Warrant of the Vehicle is Supported by Probable Cause.**

Defendant challenges the facial sufficiency of the warrant for the search of the 2006 Dodge Stratus, asserting that the warrant affidavit lacks sufficient facts to support probable cause. Defendant also challenges the sufficiency of the warrant under *Franks*, and argues that the affidavit misrepresented and omitted material information and without this information, the affidavit is insufficient to support probable cause.  *See* **Doc. 63, at 20–21**; **Doc. 73, at 22–25**.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "Under *Franks*, a Fourth Amendment violation occurs if (1) an officer's affidavit supporting a search warrant application contains a [knowing, intentional, or] reckless misstatement or omission that (2) is material because, but for it, the warrant could not have lawfully issued."  *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015).

In this case, the Court granted Defendant's request for a *Franks* hearing after finding that Defendant made a "substantial preliminary showing" that a false statement was, knowingly and intentionally, or with reckless disregard for the truth, included in the warrant affidavit. *See Franks*, 438 U.S. at 155–56; **Hr'g I Tr. 8**. Therefore, under the *Franks* analysis, "a court must strike any intentional, knowing, or reckless misstatements in the warrant application affidavit and assess the affidavit without them." *See Herrera*, 782 F.3d at 575. But if "the affidavit contains intentional, knowing, or reckless omissions, a court must add in the omitted facts and assess the affidavit in that light." *Id.* The inquiry is "whether a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts. If so, the contested misstatement or omission can be dismissed as immaterial. If not, a Fourth Amendment violation has occurred and the question turns to remedy." *Id.*; *Franks,* 438 U.S. at 155–56.

Further, "once a defendant effectively questions the validity of a search warrant by proving that an affidavit contains intentional or reckless misrepresentations, as is the case here, the magistrate judge who issued the warrant cannot be considered the primary protection of a citizen's Fourth Amendment rights." *See United States v. Adams*, 154 F. Supp. 3d 1202, 1209 (D.N.M. 2014), *aff'd*, 615 F. App'x 502 (10th Cir. 2015). It becomes the Court's responsibility to "step into the magistrate judge's shoes and determine whether the excised affidavit supports a finding of probable cause." *Id.* The Court's assessment is confined only to "reviewing the four corners of the sworn affidavit." *See United States v. Knox*, 883 F.3d 1262, 1272 (10th Cir. 2018).

Probable cause to issue a search warrant "exists only when the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001). A totality of the circumstances analysis is used to determine whether a

search warrant is supported by probable cause. *See United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001); *Illinois v. Gates*, 462 U.S. 213, 235 (1983) ("[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."). Probable cause "requires a nexus between the place to be searched and the items to be seized." *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999). The affiant must also show "a nexus between suspected criminal activity and the place to be searched." *See United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009) (internal quotations and alterations omitted). Still, "the affidavit supporting the search warrant need not contain direct evidence or personal knowledge that the items sought are located at the place to be searched." *Nolan*, 199 F.3d at 1183.

Similarly, the test for determining whether information from a confidential informant can establish probable cause is a totality of the circumstances analysis. *See generally Gates*, 462 U.S. at 230–39; *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004). An informant's "veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." *Gates*, 462 U.S. at 230 (internal quotations omitted). However, "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. Specifically, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000).

Lt. Lopez prepared a two-page affidavit which he used to secure a warrant to search Defendant's Dodge Stratus. In the affidavit, Lt. Lopez swore the following[7]:

> On 11-19-19 I received information that a male subject was in the Socorro Area attempting to sell firearms out of the trunk of a gray Dodge Stratus. I was informed that the subject went by the street name Smurf. I had prior knowledge that a male subject Manuel Arvizo went by the street name Smurf. I also knew that Manuel owned a gray in color dodge Stratus. I had done a search warrant on the

---

[7] The Court includes the text of this warrant affidavit unchanged.

Dodge Stratus several months earlier, as part of a criminal investigation involving burglaries in Catron County.

The information I had today was that the guns were in the trunk of this vehicle. I had prior knowledge that Manuel was a convicted felon and could not possess firearm.

At approx. 1300hrs I received information that there was a gray in color Dodge Stratus currently moving firearms from one car on Santa Fe Ln. to a gray car. This information matched the information I had received earlier. I went to 1206B Santa Fe Ln. where I knew Manuel's Girlfriend Angela Mascarena's lived at this location. When I arrived I saw Manuel standing at the trunk of his gray Dodge Stratus, which was open. I could see what I knew to be the barrel of a firearm in the trunk. Manuel looked into the trunk then back at me. Manuel shut the trunk and began to walk away. Manuel was ordered to the ground and taken into custody several other subjects on scene were also taken into custody. Manuel was advised of his Miranda rights the gray dodge stratus was sealed and towed to the Socorro County Annex Building pending a search warrant.

The affiant is aware that Manuel was recently linked to several burglaries in the Catron County are where guns and other property were stolen. Some of this property has already been recovered from a vehicle Manuel was arrested in a few months prior. Some of the property in this vehicle came from the same homes where guns were taken.

*See* **Doc. 81-1, Ex. F**.

Defendant claims that Lt. Lopez knowingly and intentionally omitted the following information from the affidavit in support of the warrant: (1) Lt. Lopez "did not disclose that he had already searched the car without a warrant," (2) Lt. Lopez "did not explain how he saw 'the barrel of a firearm' inside a packed trunk in which no firearms were visible," and (3) Lt. Lopez "failed to include any information about the informer's veracity, reliability or basis of knowledge." *See* **Doc. 73 at 22–24**. Defendant also argues that Lt. Lopez knowingly or recklessly included the following falsified information or misstatements: (1) Lt. Lopez stated he saw "what he knew to be the barrel of a firearm," (2) Lt. Lopez stated that the Dodge Stratus was involved in multiple burglaries in Catron County, (3) Lt. Lopez stated that Defendant was linked to previous burglaries involving weapons, and (4) Lt. Lopez stated that some of the stolen property recovered in the Dodge vehicle came from the same homes where guns were stolen. **Hr'g II Tr. 46–48**.

The Court first turns to the allegedly omitted information.  At the outset, the Court recognizes that the face of the warrant affidavits and warrant inventory returns are undeniably rife with "clerical" errors and inconsistencies.  **Hr'g I Tr. 102, 130, 143, 147–48**.  Most notably, the date and time of the signed inventory returns for the executed searches of the vehicle and the home *precede* the state court judge's issuance of the warrants.  The Court finds, however, that Lt. Lopez did not execute searches of the Dodge Stratus and the home at 148 Navajo Way prior to the issuance of these warrants.   Instead, Lt. Lopez used a "template" document for the inventory returns and failed to use the correct date and time.  **Id. at 147**.  This discrepancy appears to have gone twice unnoticed by the judicial officer who wrote in "10 AM" on the inventory returns, but signed them with the still incorrect date from the template.  Still, the Court is persuaded, based on the precise testimony of SCSO officers, that neither the home nor the vehicle were searched before the issuance of the warrants.  *E.g.*, **id. at 146–48** (testimony of Lt. Lopez) (noting that the parties received information about the vehicle tip during the lunch hour, and therefore, the search and subsequent inventory could not have occurred before noon); **id. at 53** (testimony of Det. Padilla) (stating that he was having lunch when he was called to 1206B Santa Fe Lane); **id. at 113–15** (testimony of Lt. Lopez) (asserting that he executed the search of 148 Navajo Way at night and still managed to return to Socorro County "well before midnight").  Thus, there was no omission of a statement that Lt. Lopez performed the searches before the issuance of the warrants.

As to the absence of informer's veracity or reliability, the Court finds that the absence of this information was not a reckless omission, but even so, was not material.  There is no requirement that an informant's veracity must be set forth in an affidavit, and Defendant has not provided authority for this proposition.  Lastly, Lt. Lopez's sight of the gun is more appropriately addressed as a misrepresentation, as discussed below.

26

The Court turns to the allegedly misrepresented information. After carefully reviewing the record, the Court concludes that Defendant has shown that Lt. Lopez knowingly or recklessly disregarded the truth in preparing the affidavit on three occasions. The Court notes first that Lt. Lopez's statement that he had "done a search warrant on the Dodge Stratus several months earlier, as part of a criminal investigation involving burglaries in Catron County," is not a misstatement and is accurate in the context of Lt. Lopez's police work. Lt. Lopez, however, acted recklessly when he inaccurately claimed: (1) "I could see what I knew to be the barrel of a firearm in the trunk"; (2) "The affiant is aware that Manuel was recently linked to several burglaries in the Catron County are [sic] where guns and other property were stolen"; and (3) "Some of the property in this vehicle came from the same homes where guns were taken." In short, the affidavit did not reflect what Lt. Lopez believed to be true. *See United States v. Knapp*, 1 F.3d 1026, 1029 (10th Cir. 1993) ("[A]s long as the affidavit reflected what [the affiant] believed to be true, the warrant was properly issued.").

On the first statement, the Court bases its conclusion on Lt. Lopez's inconsistent testimony and the evidence. As discussed above, Lt. Lopez has been inconsistent and not credible about his sight of the gun. Moreover, the alleged pipe he may have seen was not mentioned by anyone other than Lt. Lopez. Lt. Lopez's testimony is contradicted by the photograph of the open trunk. His testimony is also contradicted by his earlier statements and the testimony of other SCSO officers, who stated that Defendant immediately closed the trunk without the opportunity to hide a weapon.

On the second and third statements, which are intertwined, the Court bases its conclusion again on Lt. Lopez's inconsistent testimony and the record. Lt. Lopez was closely involved with the Catron County burglary to which Defendant was arrested. The record shows that the Catron County homeowner documented, in detail, his stolen property and also spoke to Lt. Lopez about

this property.  At no time were any weapons mentioned, and in fact, the most significant item recovered from Defendant, mentioned numerous times by Lt. Lopez, was a green camouflage shower curtain.  The record also includes the affidavit in support of an arrest warrant for Defendant's involvement in the burglary, and that affiant makes no mentions of guns or weapons reported stolen.  Given the significance of missing firearms, the Court finds it unlikely that both the homeowner and the affiant would omit or fail to mention the loss of a gun.  Further, Lt. Lopez admitted that other alleged burglaries involving firearms in Catron County were unrelated to Defendant and Defendant had not been associated with the theft of any weapons.

Therefore, the Court will excise the following from the affidavit: (1) "I could see what I knew to be the barrel of a firearm in the trunk," in the third paragraph of the affidavit; (2) the words "guns and" in the sentence beginning with "The affiant is aware," in the first sentence of the final paragraph; and (3) "Some of the property in this vehicle came from the same homes where guns were taken," the last sentence of the final paragraph.

The Court must now consider whether the excised affidavit supports a finding of probable cause.  Here, the totality of the circumstances does not support the determination that there was a fair or reasonable probability of finding contraband in the vehicle.  The affidavit did not provide information to establish the veracity or reliability of the confidential informant, nor was there sufficient independent corroboration of the informant's information.

When an informant's basis of knowledge is not described on the face of the affidavit, the Court must look to "whether the information contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted."  *See United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009) (internal quotations omitted).  The Court must look for "the kind of highly specific

or personal details from which one could reasonably infer that the informant had firsthand knowledge about the claimed criminal activity." *Id.* (internal alteration omitted) (quoting *United States v. Tuter*, 240 F.3d 1292, 1298 (10th Cir. 2001)).

The only police corroboration was the affiant's verification of Defendant's pseudonym, the type of vehicle Defendant drives, and Defendant's felony conviction; the warrant was devoid of corroboration of detail suggesting Defendant was in possession of a firearm or that the trunk of the vehicle contained a firearm, confirmation of predictive information, or any other disclosed basis of the informant's knowledge.  Thus, after the false statements from the affidavit are omitted, the only possible nexus between the trunk of the vehicle and any criminal activity was Defendant immediately shutting the trunk and walking away from it when police arrived.  This "nebulous connection" is insufficient for the Court to conclude that probable cause existed.  *See Danhauer*, 229 F.3d at 1006.  Therefore, the excised warrant does not support a reasonable inference that guns or evidence of a crime would be found in the trunk of Defendant's vehicle.

III.     **Whether the Good Faith Exception Precludes Suppression of the Evidence Found in the Vehicle.**

The United States asserts that the good faith exception precludes suppression of evidence in this case.  The Government argues that SCSO officers acted in good-faith reliance on the warrant to search Defendant's car because (1) "Officer Lopez verified the informant's information with Officer Lopez's own prior knowledge through a police investigation regarding Defendant and [2] [he] verified/corroborated the informant's information immediately when arriving and surveilling the car and defendant at the scene." **Doc. 70, at 13**.  The Court disagrees.

"[E]ven if a warrant is not supported by probable cause, evidence seized in good-faith reliance on that warrant is not subject to suppression." *Knox*, 883 F.3d at 1270; *United States v.*

*Leon*, 468 U.S. 897, 922 (1984).  However, there are four situations where a search conducted pursuant to an invalid warrant is not afforded the benefit of the good faith exception: (1) if the judge issuing the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) where the issuing judge "wholly abandoned his judicial role"; (3) where the underlying affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."  *See Leon*, 468 U.S. at 923.  Thus, "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  *Id.* at 926 (emphasis added).

Here, the Court concludes that the good faith exception does not apply because Defendant has shown that Lt. Lopez intentionally or recklessly disregarded the truth in his preparation of the affidavit in support of the warrant, which misled the state court judge.  Therefore, Lt. Lopez nor the executing officers can be afforded the benefit of the good faith exception.

**IV.**   **Whether the Socorro County Officers had Probable Cause to Search Defendant's Vehicle Without a Warrant.**

The United States argues that it was permitted to search Defendant's vehicle without a warrant because probable cause to search existed based on the circumstances at the scene, but asserts that here, it obtained a warrant instead.[8]   *See* **Doc. 70, at 8**.

Searches "conducted outside the judicial process without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  The "automobile exception to the warrant requirement permits law enforcement officers who have probable cause to believe a car contains contraband to search the car without first obtaining a search warrant." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (internal quotations and alterations omitted).  "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* at 1344 (quoting *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001)).  Thus, "[o]nce the officer's suspicions rise to the level of probable cause, they are empowered to search the entire vehicle, including the trunk and all containers therein that might contain contraband." *Id.* (internal quotations omitted).

In this case, the United States asserts that there was probable cause to search Defendant's vehicle at the scene and without a warrant because Lt. Lopez had knowledge of Defendant's past criminal conduct and his status as a felon, in addition to Lt. Lopez's interaction with Defendant on

---

[8] The Government also alleged that probable cause existed to arrest Defendant.  *See* **Doc. 70, at 7–8**.  The constitutionality of Defendant's arrest is not dispositive to the resolution of these motions, nor does any exception put forward by the Government rely on Defendant's arrest, *i.e.*, search incident to arrest exception.  *See Carroll v. United States*, 267 U.S. 132, 158–59 (1925) (The "right to search and the validity of the seizure [of the vehicle] are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law.").  Thus, the Court declines to address this issue.

the scene when he "saw the barrel of a firearm sticking out of the trunk of the open trunk lid that Defendant was standing in front of." *See* **Doc. 70, at 8**. The Government also asserts that Lt. Lopez had information that Defendant was selling firearms out of the vehicle and moving firearms from one vehicle to another, and this information was "immediately corroborated" upon his arrival at the scene. *Id.* **at 8**.

Defendant retorts that the Government did not have probable cause to search the vehicle because Lt. Lopez merely saw Defendant "standing at the packed trunk of his car," he did not "see a firearm in the trunk, nor could he…He also did not see Mr. Arvizo engaging with another person. Nor did he see money or guns change hands." **Doc. 73, at 6–7**. In addition, Defendant argues that SCSO officers trespassed onto the curtilage of his home and conducted a warrantless seizure and search of his vehicle in violation of *Collins v. Virginia*, 138 S. Ct. 1663 (2018). *See* **Hr'g II Tr. 48–50**.

Here, the Court goes beyond the face of the warrant. The facts known to Lt. Lopez at the time he towed Defendant's vehicle were as follows:

1. Lt. Lopez learned from an informant that "Smurf" was "trying to sell some firearms" and he would be in a "grayish color Dodge Stratus." The informant was paid for this information and had proven useful for narcotics crimes in the past. **Hr'g I Tr. 74**.

2. Lt. Lopez believed that "Smurf" was Defendant, that the Dodge Stratus was Defendant's vehicle, and Defendant was previously convicted of a felony and could not possess a weapon.

3. Sheriff Armijo independently learned from an informant that a "male subject" was "unloading" or "loading" stolen firearms into or out of a "gray Pontiac." **Hr'g I Tr. 38–39**. Sheriff Armijo informed Lt. Lopez of this information. The background of this source is unknown, and it is unclear if this source was the same individual that contacted Lt. Lopez.

4. When SCSO officers arrived at Santa Fe Lane, Defendant was seen at the trunk of his vehicle, which was parked next to another vehicle, a Nissan Altima, and Defendant immediately shut the trunk and walked away.

5. The owner of the adjacent vehicle granted officers permission to search her vehicle, and this search revealed ammunition, but no weapons.

Based on the totality of circumstances, the Court concludes that there was a "fair probability" that the trunk of the Dodge Stratus contained contraband or evidence of a crime after Lt. Lopez gained consent to search the trunk of the Nissan Altima and it revealed ammunition. Finding this ammunition, the officers could draw a reasonable inference that there was a fair probability that ammunition or weapons may be found in the Dodge Stratus based on the tips received. Nevertheless, the Court concludes that the automobile exception is inapplicable.

As an initial matter, "the Fourth Amendment does not govern unrealized *intentions* to search or seize." *Trujillo*, 993 F.3d at 873 (emphasis in original). The Court's review is confined to when the search of the vehicle took place, which was after the impoundment, not when it *could have* taken place. Because the search here occurred only after police had taken custody of the vehicle, the automobile exception is valid only if taking custody of the vehicle was valid.

When the police have probable cause to believe a vehicle contains contraband or evidence of criminal activity, the police may seize it without a warrant and hold it for "whatever period is necessary to obtain a warrant for the search." *United States v. Shelton*, 817 F. App'x 629, 634 (10th Cir. 2020). For constitutional purposes, there is "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers v. Maroney*, 399 U.S. 42, 52 (1970).

There are heightened requirements, however, when police search or seize vehicles from private property. *See, e.g.*, *Sanders*, 796 F.3d at 1249; *Collins*, 138 S. Ct. at 1671 ("Nothing in our case law, however, suggests that the automobile exception gives an officer the right to enter a home or its curtilage to access a vehicle without a warrant."). "[A]n officer must have a lawful

right of access to a vehicle in order to search it pursuant to the automobile exception." *Collins*, 138 S. Ct. at 1672. "The automobile exception does not afford the necessary lawful right of access to search a vehicle parked within a home or its curtilage because it does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage." *Id.* (holding that the automobile exception did not justify the warrantless search of a motorcycle that was parked at the top of a driveway that "abut[ted] the house" of the defendant's girlfriend, where he stayed a few nights per week). Thus, both the decision to take the car into custody and the accompanying probable cause search must meet the requirements of the Fourth Amendment.

Here, the Government has failed to meet its burden to show that the impoundment of the vehicle was proper under the community-caretaking function. The Government has also failed to sufficiently address whether the automobile exception otherwise extends to justify the seizure. *E.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 458–64 (1971) (Stewart, J., plurality) (holding that the automobile exception did not apply to a seizure and subsequent search at a police station of a vehicle that was parked in the defendant's driveway, even where probable cause existed to search the car and defendant's earlier arrest inside the home). Therefore, notwithstanding any probable cause determination regarding the subsequent search at the impound lot, because the United States has failed to meet its burden to show that the impoundment of the vehicle from private property was justified or reasonable in the first instance, probable cause validating the later search does not absolve its unconstitutional impoundment.

## V.   <u>Whether the Inevitable Discovery Doctrine Precludes Suppression of the Evidence Seized from the Vehicle.</u>

The United States argues that evidence from the vehicle would have been inevitably discovered through a lawful inventory search after Defendant's arrest and the impoundment of his

vehicle, and therefore, the evidence should not be suppressed. *See* **Doc. 70, at 11**. The Government's argument is unavailing.

When the Government obtains evidence through an unconstitutional seizure or search, the evidence is inadmissible under the exclusionary rule unless an exception applies. *See Mapp v. Ohio*, 367 U.S. 643, 655–58 (1961). "In addition, a defendant may also suppress any other evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence." *See United States v. Olivares-Rangel*, 458 F.3d 1104, 1108–09 (10th Cir. 2006).

One of the exceptions to the exclusionary rule is the inevitable discovery doctrine. *See United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005). The inevitable discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *Id.* (internal quotations omitted). Thus, the inevitability of discovering evidence by lawful means removes the taint from evidence first discovered through unlawful means. *See Nix v. Williams*, 467 U.S. 431, 444 (1984).

"Those lawful means include an inventory search." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003). "When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to standard police procedures and for the purpose of protecting the car and its contents." *United States v. Lugo*, 978 F.2d 631, 636–37 (10th Cir. 1992). "[S]tandardized criteria must regulate inventory searches to ensure that they are not used as a ruse for a general rummaging in order to discover incriminating evidence." *Id.* (internal quotations omitted). The burden rests on the Government to prove "by a preponderance of the evidence that

the evidence at issue would have been discovered without the Fourth Amendment violation." *See Cunningham*, 413 F.3d at 1203.

In this case, no inventory of the contents of Defendant's vehicle could have been conducted but for the unlawful impoundment of the vehicle. Thus, the Government cannot claim that the evidence eventually seized after the impoundment would have been inevitably discovered. *See United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992). Accordingly, the inevitable discovery doctrine does not apply and cannot operate to remove the taint of the Fourth Amendment violation. The evidence seized from the 2006 Dodge Stratus is inadmissible and must be suppressed.

## VI.   **Whether the Search Warrant for 148 Navajo Way is Supported by Probable Cause.**

The Court now considers the validity of the search warrant for 148 Navajo Way. Defendant primarily contends that this warrant is invalid because it lacks probable cause and relies on his unwarned, custodial statements, in violation of *Miranda v. Arizona*. *See* **Doc. 90**.

The Fifth Amendment states that no individual "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment requires that an individual subject to custodial interrogation be informed clearly and unequivocally of several rights.[9] *See Miranda v. Arizona*, 384 U.S. 436, 467–73 (1966); *United States v. Erekson*, 70 F.3d 1153, 1156 n.1 (10th Cir. 1995). These warnings form "an absolute prerequisite to interrogation." *Miranda*, 384 U.S. at 471.

*Miranda*, however, only applies when an individual is subject to "custodial interrogation." *See United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000); *Miranda*, 384 U.S. at 444. Any questioning by law-enforcement officers "reasonably likely to elicit an incriminating

---

[9] The right to remain silent, that anything said can and will be used against the individual in court, the right to consult with a lawyer, and if indigent, the right to an appointed lawyer. *Arizona*, 384 U.S. at 467–73.

response" constitutes an interrogation.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  But

a person is in custody for *Miranda* purposes only when their "freedom of action is curtailed to a

degree associated with formal arrest."  *Hudson,* 210 F.3d at 1190.

      Here, there is no dispute that Defendant was in custody; Defendant was incarcerated at the

Socorro County Detention Center when he was interviewed by Lt. Lopez and Agent Lopez.  There

is also no dispute that the officers interrogated Defendant.  Thus, the inquiry is whether Defendant

was given a *Miranda* warning by Lt. Lopez or Agent Lopez prior to the initiation of this interview.

The United States did not meet its burden to show, and appears to concede, that neither Lt. Lopez

nor Agent Lopez provided Defendant with a *Miranda* warning.  **Hr'g I Tr. 152** (testimony of Lt.

Lopez) (noting that he did not know and could not remember if he gave a *Miranda* warning, and

he did not have a written *Miranda* waiver from Defendant); **Hr'g II Tr. 9** ("There was not a

renewal of *Miranda* rights, although [Defendant] had been *Mirandized* previously.").  Thus, the

statements elicited from Defendant were in violation of *Miranda*.

      Defendant argues that the Court must excise these statements from the warrant, and without

them, the warrant fails to establish probable cause to support the search of the home.  *See* **Doc. 90,**

**at 5–9**.  The Government concedes that the un-*Mirandized* statements of Defendant are likely

"tainted," **Hr'g II Tr. 9–10**, but argues that this Court may find the warrant valid where the

remainder of the "untainted information" is independently sufficient to establish probable cause.

*Id.* **at 10–11**.

      "When a warrant is tainted by some unconstitutionally obtained information," the Court

may "nonetheless uphold the warrant if there was probable cause absent that information."  *United*

*States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005); *United States v. Cusumano*, 83 F.3d 1247, 1250

(10th Cir. 1996).  The affidavit in support of the warrant contains the following information

obtained in violation of *Miranda*: "Manuel did not disclose whether he had more guns[,] but through[out] the interview I noted several indications that Manuel may have more guns as Manuel did indicate that he had access to more firearms." *See* **Doc. 81-2, Ex. G, at 3**.  Excising this, and other tainted material in the affidavit, including the results of the unlawful search of the Dodge Stratus and Lt. Lopez's intentional or reckless misrepresentations, the warrant now reads[10]:

> On 11-19-19 I received information that a male subject was in the Socorro Area attempting to sell firearms out of the trunk of a gray Dodge Stratus. I was informed that the subject went by the street name Smurf. I had prior knowledge that a male subject Manuel Arvizo went by the street name Smurf. I also knew that Manuel owned a gray in color dodge Stratus. I had done a search warrant on the Dodge Stratus several months earlier, as part of a criminal investigation involving burglaries in Catron County.

> The information I had ~~today~~ on 11-19-2019 was that the guns were in the trunk of this vehicle. I had prior knowledge that Manuel was a convicted felon and could not possess firearm.

> At approx. 1300hrs I received information that there was a gray in color Dodge Stratus currently moving firearms from one car on Santa Fe In. to a gray car. This information matched the information I had received earlier. I went to 1209B Santa Fe Ln. where I knew Manuel's Girlfriend Jessica Mascarena's lived at this location. When I arrived I saw Manuel standing at the trunk of his gray Dodge Stratus, which was open . Manuel looked into the trunk then back at me. Manuel shut the trunk and began to walk away. Manuel was ordered to the ground and taken into custody several other subjects on scene were also taken into custody. Manuel was advised of his Miranda rights the gray Dodge Stratus was sealed and towed to the Socorro County Annex Building pending a search warrant.

> Shortly after the arrest the source who informed me about the guns initially, relayed information that these were not all the guns that Manuel had. I was informed that Manuel had more guns hidden at a location in Catron County. This source did not know exactly where these other guns were located, or where they came from.

> On 11-20-19 I along with FBI agent Leica Lopez interviewed Manuel Arvizo about the guns located in his car.

> On 11-20-19 I was contacted by a source who stated they had information on the whereabouts of the rest of the firearms. The source was in fear of there life and asked not to be named. The source said that they had direct knowledge that the additional firearms were located at 148 Navajo Way in Catron County. The source said that they saw these guns at the home two days ago. This location is the property on Manuel Arvizos uncle and the property was recently search by the Catron

---

[10] The Court includes the text of this warrant affidavit unchanged, but for excision of tainted, unconstitutionally obtained information.

County Sheriffs Office as part of burglaries that Manuel Arvizo had been linked to recently. Stolen property was located at this property during the recent search.

The affiant is aware that Manuel was recently linked to several burglaries in the Catron County where other property were stolen.

*See* **Doc. 81-2, Ex. G**.

The Court must ask whether sufficient facts remain to establish probable cause. Without the tainted information, the Court finds that the affidavit does not support a conclusion that there was a fair probability that contraband or evidence of a crime would be found at 148 Navajo Way. The information from the first informant is an uncorroborated tip without any indicia of reliability. The information from the second informant also lacks any indicia of reliability and sufficient independent corroboration of this informant's statement. To be sure, "a firsthand observation is entitled to greater weight than secondhand information." *See Quezada-Enriquez*, 567 F.3d at 1233. However, the second informant's statement lacks a sufficient nexus between the criminal activity, Defendant's unlawful possession of a weapon, and the place to be searched. Lt. Lopez's statements about burglaries in Catron County also fail to create a sufficient or plausible nexus between the suspected criminal activity and the place to be searched. Without Defendant's un-*Mirandized* statement and the fruits of the search from the Dodge Stratus, the warrant does not adequately support a reasonable belief that evidence of a crime would be found at 148 Navajo Way. Thus, the warrant lacks probable cause.

Here too, as discussed above, the Court concludes that the good faith exception does not apply because Defendant has shown that Lt. Lopez intentionally or recklessly disregarded the truth in his preparation of this affidavit in support of the warrant, as this warrant affidavit contained the same material misrepresentations as the affidavit for the vehicle. Therefore, evidence seized from the home at 148 Navajo Way must be suppressed. Because the Court concludes that the warrant

lacks probable cause and the good faith exception does not apply, the Court need not address Defendant's argument regarding whether the warrant lacks particularity.  *See* **Doc. 90, at 12**.

**CONCLUSION**

The Government has failed to meet its burden to establish that the impoundment of Defendant's vehicle was valid under an exception to the Fourth Amendment warrant requirement. Defendant sufficiently met his burden to show that the search warrants for the 2006 Dodge Stratus and 148 Navajo Way, Datil, New Mexico were invalid.  Therefore, the Court grants Defendant's motions, and orders suppression of all evidence seized from the vehicle and the home.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence (**Doc. 63**) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Statements as well as Evidence Derived from those Statements (**Doc. 90**) is **GRANTED**.

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE